**THE MCDANIEL LAW FIRM, PC**
54 Main Street
Hackensack, New Jersey 07601
(201) 845-3232
(201) 845-3777 (Facsimile)
*Attorneys for Plaintiff*

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AMSELFILM PRODUCTIONS, GMBH & CO. KG, <br><br> Plaintiff, <br><br> v. <br><br> JOHN DOES 1-187, such persons being presently unknown participants and members of a joint enterprise, and SWARM # 6A6DC, a joint enterprise, <br><br> Defendants. | Civ. Action No. 2:12-cv-3865(FSH)(PS) |

**AMSELFILM PRODUCTIONS, GMBH & CO. KG'S MEMORANDUM OF LAW IN SUPPORT OF
ITS MOTION FOR LEAVE TO TAKE EXPEDITED DISCOVERY
PRIOR TO THE RULE 26 CONFERENCE**

On the brief:
Jay R. McDaniel, Esq.

Plaintiff AMSELFILM PRODUCTIONS, GMBH & CO. KG ("Amselfilm") hereby respectfully submits this Memorandum of Law in support of its Motion for Leave for Expedited Discovery Prior to the Rule 26(f) Conference.

### PRELIMINARY STATEMENT

This case presents a fundamental issue of first impression within this Circuit and, as far as we have been able to determine, nationwide: can a torrent swarm – that is the network of operators and equipment established for the sole purpose of unlawfully distributing a copyrighted work, be sued in any jurisdiction in which it has a physical presence? Plaintiff's position is that the answer to that question is yes, whether the Court relies on an enterprise theory, contributory infringement, or the fact that the Defendants together operated a network for the purpose of infringing the rights of a copyright holder.

Likely no issue is more litigated within the federal courts at the present time. Our review of the opinions and orders published on Lexis showed 54 such opinions and orders in the first six months of 2012.[11] Within a recent five day period, four such opinions or orders were issued. The fundamental issue in each of these opinions is whether torrent defendants may be joined in a multi-defendant action. Twenty-seven (27) of those opinions and orders found that joinder was proper. Seventeen (17) of the opinions and orders severed the defendants.

This case presents an issue of first impression in that it does not seek recovery for illegal copying, but rather for illegal distribution, and that it pursues a claim against the distribution network, first, and seeks to impose liability against defendants jointly and severally as the operators of the network and participants in a scheme to unlawfully distribute among themselves

---

[11]   We will be pleased to provide copies of these opinions to the Court in addition to the authority cited in this Memorandum.

a pirate copy of a work protected by United States copyright law and international treaty. Plaintiff has identified the physical locations from which network operated within this judicial district, specifically the Internet service account, communications equipment (modem) and the existence of file server from which an illegal copy was distributed.  While the individual defendants frequently claim innocent infringement – that they did no know of the distribution or were unaware of the nature of their activities – these are affirmative defenses to be pleaded and proved and not a relevant consideration on this application.

Proving infringement of a copyright holder's exclusive right to copy is difficult and intrusive, requiring examination of personal computers and individual discovery.  Proving distribution is feasible and reliable, and Plaintiff's Complaint not only states a viable claim against the Swarm and the individual defendants, it provides direct evidence of the prima facie elements of its case.  As this Court is well aware, liability under the Copyright Act is a strict liability offense.  Innocent infringement is an affirmative defense to statutory damages, but it is no grounds to dismiss a claim, even less so to deny essential discovery to determine the identity of defendants.

### IN RE BITTORRENT ADULT FILM COPYRIGHT INFRINGEMENT CASES

While District Courts have been issuing opinions and orders on nearly a daily basis, they have received little if any guidance from Appellate Courts.  This Court has asked us to comment on the recent report of Magistrate Brown in the Eastern District of New York.  (Judge Brown's opinion, for example, has been followed only once by other federal judges sitting in New York.) This opinion, like other opinions and orders that are in the minority, and refuse to permit any joinder and make a number of common errors.

- They do not understand the technology or make reasoned applications of established principles of law to recognizable unlawful conduct based

    solely on the fact that the conduct occurred by digital means. In the same way that e-mail replaces the fax machines that replaced ordinary mail, but all are means of correspondence, torrent networks replace bootleg video stores, and street peddlers and illegal download sites. The purpose, however, is identical.

- As with Judge Brown's opinion, these decisions are colored by hostility to what is perceived as abusive litigation tactics engaged in by lawyers representing pornography distributors. We have no knowledge of the specific tactics used by other lawyers or plaintiffs, but suggest that to impose sanctions against the plaintiff in one case based on behaviors of others in other cases is improper.

- The decisions, such as that of Judge Brown, engage in impermissible fact-finding without providing procedural or substantive due process, prior to joinder, in the absence of discovery and without any developed factual record.

- The decisions disregard the well-pleaded complaint rule, i.e., that the allegations of the Complaint at the pleading stage are to be accepted as true.

- The decisions distort the burden of proof for the affirmative defense of innocent infringement, i.e., plaintiffs must eliminate the possiblity of innocent infringement at the pleading stage.

It is significant that to the extent that Judge Brown suggests either that the participants of a torrent network do not participate in the worldwide distribution of a copyrighted work, he is wrong as a technical matter and as a matter of law. ("[t]he bare fact that Doe clicked on a command to participate in the BitTorrent Protocol does not mean that they were part of the downloading with unknown hundred or thousands of individuals across the country or across the world." (Slip. Op. at 19). On the contrary, that is <u>exactly</u> what happens when one joins a torrent. They become one of the operators of the torrent, and the torrent exists for one purpose only: to distribute the work unlawfully. The essential nature of the torrent <u>is</u> the concerted action, i.e., sharing of a pirated copy. Without such sharing, the torrent would not exist. It matters not that persons may come onto, or drop off the torrent – or simply turn their computer off for the night –

they have joined the network and, in this case, have been conclusively identified as a communications point for the network actively engaged in unlawful distribution.

The suggestion that distribution, without more, is not infringement is incorrect. Similarly, the suggestion that it is not the public interest to prevent such conduct is incorrect. The only difference between the torrent cases and the plethora of actions in which courts have held networks liable for infringement or facilitating infringement is that, with the torrent network, the traditional "server" responsibilities are shared among the operators. For example, in MGM v. Grokster, 545 U.S. 913, 936, the Supreme Court had no difficulty holding the developer of software intended to facilitate infringement liable for the conduct of the actual infringers. Where an individual defendant, as a member of the Swarm, offers a pirated copy of a work to every other member of the Swarm, they are a participant in purposeful distribution of a copyrighted work, and jointly and severally liable for the consequences. See, e.g., Arista Records v. Callie, Civ. Action No. 07-civ-712, 2007 U.S. Dist. LEXIS 43563 (D.N.J. June 15, 2007)(Defendant who makes pirated music available is infringer); BMG Music v.Gonzalez, 2005 U.S. Dist. LEXIS 910 (N.D. Ill. Jan. 7, 2005) (to permit a defendant "to assert [an innocent infringer] defense based on her ignorance would eviscerate copyright protection and the old adage that 'ignorance is no defense to the law.'"); Arista Records, LLC v. Usenet.com, 633 F. Supp. 2d 124 (S.D.N.Y. 2009), citing New York Times Co., Inc. v. Tasini, 533 U.S. 439 (2001) (direct infringement by permitting downloading of copyrighted work.)

Finally, it is worth noting that Judge Brown's assessment of the judicial efficiency, or lack of efficiency, arising out of joinder must assume that plaintiffs will not actually proceed with individual cases. While there are logistical issues that may make the joinder of large

numbers of multiple defendants more difficult,[12] the alternative of tens of thousands of individual lawsuits is far less desirable. Federal Courts and numerous state Courts have long recognized that similar claims should be managed together (e.g., the Panel on Multi-District Litigation and multiple special purpose courts and such litigation is commonplace.)

There is no reason to believe that filing fees would cover the cost of the judges necessary to adjudicate individual cases. They would, however, effectively foreclose recovery for many small independent producers and distributors, such as Amselfilm. The average case load in this Judicial District is about 525 matters. For every thousand defendants, using current staffing levels, the taxpayers would be required to fund two district judges, one magistrate, five clerks and three secretaries.[13] The fact that some defendants may have individualized defenses does not overcome the common issues present in considering, for example, 1,000 initial conferences; 1,000 expert reports; 1,000 expert hearings and the likely potential for conflicting findings of fact and law. The fact is that under any other circumstances, the Courts would consolidate such cases as the only rational means of handling the work.

Finally, it is important to note that multiple litigations across multiple judicial districts only encourage piracy. Most defendants will not be sued, but those that are sued must shoulder the entire burden. They have no chance seek contribution from other jointly liable defendants, to share expenses or to benefit from the efficiencies of scale. If each defendant spends just $15,000 on defense costs, the legal bill for 1,000 cases is $15,000,000. Filing fees add another $350,000

---

[12] See Slip Op. at 20. We doubt that some of the issues noted by Judge Brown as defenses – "age, religious convictions, technological savvy" are viable defenses under the Copyright Act.

[13] See federal caseload statistics at http://www.uscourts.gov/Viewer.aspx?doc=/uscourts/Statistics/FederalJudicialCaseloadStatistics/2011/tables/C00Mar11.pdf

5

to the costs that must be shouldered by defendants. The use of case management techniques furthers the efficient and prompt resolution of these disputes.[14]

---

[14] We do not agree with Judge Brown's derogatory references to mass settlements. Settlement of a controversy rather than litigation through trial is good public policy. The issue of whether such settlements are achieved through embarrassment, even if valid, does not concern this Plaintiff. In any event, it is easily dealt with by simply referring to defendants in public filings by their initials rather than their full names.

**STATEMENT OF FACTS**

Swarm# 6A6DC and each of the "Doe" Defendants as the operators of the Swarm have engaged in the unlawful distribution of the work "Bablo" using Peer-to-Peer ("P2P") networks and torrent technology ("torrent") (Declaration of David Farris, July 13, 2012, ¶¶ 17-19, 23-25). As discussed in more detail below, members of Swarm# 6A6DC continue to engage in the unlawful distribution of the work. (Id. ¶ 26.) Amselfilm stands to lose the ability to prosecute its copyright infringement claims without the ability to obtain expedited discovery in order to identify the Doe Defendants.

**USE OF TORRENT TECHNOLOGY**

The Internet is a global computer network. Once a creative work – sound, visual or otherwise -- is placed in digital format, that work can be replicated and distributed over the Internet an unlimited amount of times without significant degradation in picture or sound quality. (Farris Decl. ¶ 7.) The unlawful distribution of copyrighted sound recordings and motion pictures over the Internet frequently occur via "peer-to-peer" ("P2P") networks using a Bit Torrent Protocol ("torrent"). In this litigation, a pirated copy of "Bablo" was, and continues to be, distributed in violation of the rights of Amselfilm. (See Farris Decl. ¶¶ 23-25.) The Bit Torrent protocol creates a network of computers and Internet connections that permit Internet users, regardless of the limited uploading and downloading capabilities of their Internet service account, to participate in transferring large amounts of data across the P2P network. This P2P network is called a "torrent" or a "swarm." Each user in a torrent acts as both a file server and a network node, offering to distribute and distributing content to any user that connects to the torrent (Farris Decl. ¶ 9)

A torrent is started by a "seed," the user who makes the first piratical copy and publishes it to the torrent. The torrent software assigns this seed file a unique alpha-numeric number, known as the "hash," and breaks the file into many smaller files. The work is distributed in the form of many small files and the hash will be used both to identify that particular file to other torrent users and to facilitate the reassembly of the entire work. Other users, known as "peers" can then join the P2P network and connect to the seed file in order to download the work to their own computers. As the file is copied to each new user's computer, it is also offered to other members of the torrent. Each participant in the torrent makes an unauthorized copy of the work and, more importantly, becomes a worldwide distributor of the work to any other user connected to the torrent. (Farris Decl. ¶¶ 10-12.)

The individual that distributes a work on a torrent must have taken several affirmative steps to joint the torrent, to start receiving a copy of the file, and to and begin distribution. First, the individual must install a torrent client, which is a program installed on an individual computer to manage torrent distribution. Second, the user must locate a swarm that is distributing the work. Most often, torrent users find swarms through "torrent trackers," web sites that identify and advertise torrents from which content can be downloaded. Third, the torrent member must initiate the download. Thereafter, the torrent will find the missing parts of the file (searching across all the Swarm users then connected), download the missing parts, and reassemble the final work. (Farris Decl. ¶¶ 12-14.)

Because torrent technology uses piecemeal distribution, the network of users distributing the same content, in this case a movie soundtrack, it is generally referred to as a "swarm." The swarm is a *discrete* network that distributes identical content virally across the Internet. Within hours, a torrent can distribute content to tens or even hundreds of thousands of users because the

8

torrent's ability to expand to encompass new users, new file servers and new points of network communications has no technical limits. (Farris Decl. ¶13.)

Amselfilm engaged Baseprotect, GmbH to monitor illegal distribution of "Bablo", including distribution across torrent networks. Baseprotect identified Swarm #6A6DC as a discrete network engaged in the distribution of a copy of "Bablo". Baseprotect verified that the Swarm was engaged in distributing a copy of the work by downloading and manually inspecting a copy from the Swarm. (Farris Decl. ¶¶ 16-19.)

Having identified the Swarm and confirmed the authenticity of the work, Baseprotect has monitored the Swarm and identified individual operators of the Swarm by IP address and the date and time on which the work was being offered. In addition to identifying the work, Baseprotect confirmed that work was <u>in fact being distributed</u> from that specific IP address by connecting to the Swarm user's computer and downloading a portion of the file. In the process, Baseprotect recorded the specific torrent program used by the Swarm member; the identity of the file offered for distribution; the size of the file offered for distribution, the fact that the file was, in fact, available for download, the GUID code (a unique machine-specific code incorporating information about the software used, IP address and network card used to communicate with the network) and in most cases the portal number used by the computer to connect to the torrent. The information collected by Baseprotect is conclusive proof of the fact of unauthorized distribution from a computer connected to Swarm from a particular IP address. (Farris Decl. ¶¶ 23-25.)

Baseprotect retained this information in its databases and identified the ISP that provided the Internet service from which the work was distributed by each of the Doe Defendants. The

9

technology and procedures utilized by Baseprotect are well-accepted as accurate and reliable within the digital rights enforcement industry. (Farris Decl. ¶ 21.)

## DISCOVERY OF INDIVIDUAL IDENTITIES

The ISPs maintain service logs that identify account holders by IP address and date and time of connection. By issuing subpoenas to ISPs to disclose the identity of the account holders, Plaintiff will ultimately secure the identity of the parties engaged in distribution. The information in the ISPs service logs, however, are purged, most frequently after 180 days. Moreover, the processing of subpoenas issued to ISPs is time consuming. ISPs are required by the Cable Act, 47 U.S.C. § 551(c) to provide notice to any user prior to release of person information. Cable companies and may take several months to comply with a subpoena. The process of discovering the true identities of the persons owning the accounts from which the work was distributed must begin promptly or Plaintiff risks losing any remedy. (Farris Decl. ¶¶ 22-23, McDaniel Decl. ¶¶ 4-6).

Discovery of the individual identities and an order to preserve digital evidence is also necessary to retain the discoverable information to which Plaintiff is entitled by the Federal Rules of Civil Procedure. The information is easily lost – whether by an intentional or unintentional act[15] -- and an order is necessary to preserve digital evidence for discovery.

---

[15] An individual that is unaware of the fact that they are Defendants in this lawsuit may easily delete files inadvertently (as for example by moving the copy to another media or simply deleting the copy from their hard drive.) In addition, many Defendants are likely to be unaware of their obligation to preserve such evidence, or risk sanctions for spoliation. Finally, some bit torrent activists advise Defendants to ignore complaints or takedown notices under the DMCA and delete the evidence from their computers, without also informing their readers that such conduct is unlawful and could subject a Defendant to sanctions.

## LEGAL ARGUMENT

**I.     This Court has jurisdiction over the Swarm and each of the Defendants.**

The Defendant Swarm in this case is a network of computers and communications equipment operated and maintained by the individual Defendants. The Swarm itself meets the ordinary customary definition of an enterprise in that it is an association of individuals pursuing a common goal for profit.[16] The Swarm network is known to have multiple connection nodes, computers and network equipment located in this State, and thus maintains a physical presence in this district that subjects it to the jurisdiction of this Court. "Among the most firmly established principles of personal jurisdiction in American tradition is that the courts of a State have jurisdiction over nonresidents who are physically present in the State." Burnham v. Superior Court of Cal., 495 U.S. 604, 610 (U.S. 1990)**.**  As discussed at length in the Farris Declaration, the Swarm is a *discrete* network distributing a particular copy of the work. It is an entity with an ongoing existence and a single purpose – the unlawful distribution of the work.[17]

---

[16]     While one might debate whether the conduct of an individual in avoiding the expense of buying a DVD could fairly be construed as motivated by profit, when one considers the conduct of the Defendants at the Swarm level, the contrary is true. The Swarm seeks to and does establish a distribution network that competes directly with the business authorized to distribute a popular work. The cost of establishing and maintaining such a distribution network, if legal, would likely run into the hundreds of thousands (or millions) of dollars. See Capitol Records v. Thomas-Rasset, 680 F. Supp. 1045, 1059 (D. Minn. 2010)("a license to engage in Defendant's [distribution] activity would be prohibitively expensive because to obtain the license, one would have to buy the company.")  In this case, the Swarm has duplicated thousands of copies of the work.

[17]     It is a general principle that jurisdiction over a single general partner confers jurisdiction over the partnership. See Donatelli v. National Hockey League, 893 F. 2d 459, 466 (1st Cir. 1990), accord Miller Yacht Sales, Inc. v. Smith, 384 f. 3d 93, 95 n. 1(3d Cir. 2004). The Swarm had a single purpose, distribution of the subject work. Although operating in the digital rather than the physical realm, it is clear that each member similarly had authority to further the purpose of the Swarm in further distributing the work.

11

The Swarm purposefully distributed pirated copies of copyrighted content. The Swarm, through the individual Doe Defendants, maintained copies of the work on multiple servers in this State, and distributed the work from Internet accounts located within this State. The Swarm thus maintained a physical presence within this jurisdiction, operated within this jurisdiction, and is subject to the jurisdiction of this Court.

In a similar manner, it is a well-established principle that an Internet business that targets residents of forum state and/or knowingly conducts business with residents of the forum state via its web site is subject to personal jurisdiction. Toys "R" Us, Inc. v. Step Two, S.A., 318 F.3d 446, 452 (3d Cir. N.J. 2003), citing Zippo Mfg. Co. v. Zippo DOT Com, Inc., 952 F. Supp. 1119 (W.D. Pa. 1997); ALS Scan v. Digital Service Consultants, Inc., 293 F.3d 707 (4th Cir. 2002). Similarly, a court may consider other contacts as determining whether there was "purposeful availment" within a forum state. See Toys "R"Us, supra, at 453-54. The same principles that apply when determining jurisdiction in Internet web sites apply to a Swarm, which is functionally no different than an Internet website that permits downloading of content. Because the swarm distributed content to residents of this state and distributed content from residents of this State, this Court has personal jurisdiction over the Swarm.

In addition, each individual Defendant as an operator of the Swarm is jointly and severally liable with the other operators. Harris v. Miller, 50 U.S.P.Q 625, (S.D.N.Y. 1941 )(noting exception to general rule of several liability when infringement was a joint venture.) Parties that distribute copyrighted works on a torrent are subject to personal jurisdiction in any jurisdiction in which the Swarm is subject to jurisdiction. The individual Defendants are jointly and severally liable for damage caused by their behavior as operators of Swarm network to distribute pirated copies of plaintiff's work. Bringing the individuals defendants before the court

in a jurisdiction in which the Swarm operated does not offend traditional notions of fair play and is the only manner if which plaintiff may secure relief. Moreover, failure to bring all defendants before the Court in a single action is necessary to protect the interests of the defendants and to protect against conflicting legal and factual determinations made in dozens of filings in states around the Country.[18]

## II. Amselfilm demonstrates good cause and requires expedited discovery in order to prosecute its copyright infringement claims.

Amselfilm requires the actual identity of the Defendants and Courts routinely allow discovery to identify "Doe" Defendants. See Murphy v. Goord, 445 F. Supp. 2d 261, 266 (W.D.N.Y. 2006) (where the identity of alleged defendants is unknown prior to the filing of a complaint, the plaintiff should have the opportunity to pursue ex parte discovery to identify the unknown defendants); Valentin v. Dinkins, 121 F. 3d 72, 75-76 (2d Cir. 1997) (plaintiff should have been allowed to conduct discovery to reveal identity of the defendant); Wakefield v. Thompson, 177 F. 3d 1160, 1163 (9th Cir. 1999) (error to dismiss Doe defendants given the possibility that their identity could be ascertained through discovery); Dean v. Barber, 951 F. 2d 1210, 1215 (11th Cir. 1992) (error to deny plaintiff's motion to join John Doe defendant where the identity of John Doe could have been ascertained through discovery); Gillespie v. Civiletti, 629 F. 2d 637, 642 (9th Cir. 1980) ("where the identity of alleged defendants [are not] known prior to the filing of a complaint . . . the plaintiff should be given an opportunity through discovery to identify the unknown defendants"); Maclin v. Paulson, 627, F. 2d 83, 87 (7th Cir. 1980) (where "party is ignorant of defendants' true identity . . . plaintiff should have been

---

[18] While management by the Multi-District Litigation Panel might be an alternative means to manage this multi-party dispute, the anonymity of defendants at this point makes removal to the MDL an impossibility, as defendants have to right to be notified and object prior to removal.

permitted to obtain their identity through limited discovery"); Equidyne Corp. v. Does 1-21, 279 F.Supp.2d 481, 483 (D. Del. 2003) (allowed pre-Rule 26(f) conference discovery from ISPs to obtain the identities of anonymous users posting messages on message boards).

Courts maintain broad discretion over discovery matters and will allow parties to conduct discovery prior to a Rule 26(f) conference where the moving party establishes "good cause" for such discovery. See Semitool, Inc. v. Tokyo Electron Am., Inc., 208 F.R.D. 273, 275-76 (N.D. Cal. 2002); Warner Bros. Records, Inc. v. Does 1-6, 527 F. Supp.2d 1, 2 (D.D.C. 2007); Qwest Comm. Int'l, Inc. v. WorldQuest Networks, Inc., 213 F.R.D. 418, 419 (D. Colo. 2003).

Good cause for discovery prior to a Rule 26(f) conference exists where "physical evidence may be consumed or destroyed with the passage of time, thereby disadvantaging one or more parties to the litigation." Qwest Comm., 213 F.R.D. at 419; see also Pod-Ners, LLC v. Northern Feed & Bean of Lucerne LLC, 204 F.R.D. 675, 676 (D. Colo. 2002) (allowing discovery prior to a Rule 26 discovery conference to inspect items in the defendant's possession because those items might no longer be available for inspection if discovery proceeded in the normal course). The danger of data spoliation of the ISP user activity logs is high because ISPs retain these logs bearing identifying information for a limited time. (Farris Decl. ¶ 10.) Amselfilm has good cause for conducting expedited discovery because once that information is erased, Amselfilm will have no way of identifying the alleged infringers. (Id.)

Amselfilm also has good cause for expedited discovery through its allegations of copyright infringement of the work "Bablo". Good cause is also established in allegations of copyright infringement, which presumes irreparable harm. See 14 Melville B. Nimmer & David Nimmer, Nimmer on Copyright §14.06[A], at 14-103 (2003); Semitool, 208, F.R.D. at 276; Qwest Comm., 213 F.R.D. at 419 ("The good cause standard may be satisfied . . . where the

14

moving party has asserted claims of infringement."); UMG Recordings, Inc. v. Doe, 2008 WL 4104214 (N.D. Cal. 2008) (finding good cause for expedited discovery exists in Internet infringement cases, where a plaintiff makes a prima facie showing of infringement, there is no other way to identify the Doe defendant, and there is a risk that the ISP will destroy its logs prior to the Rule 26(f) conference.).

Amselfilm further demonstrates good cause because it seeks very limited discovery from the ISPs in order to move the case forward. At this point, Amselfilm only seeks to obtain the actual identity of each Defendant and no other substantive information. Amselfilm's ability to prosecute this case outweighs the prejudice to the Doe Defendants. See Semitool, 208 F.R.D. at 276 ("Good cause may be found where the need for expedited discovery, in consideration of the administration of justice, outweighs the prejudice to the responding party."). Without the actual identities of the Defendants, Amselfilm will be unable to proceed with its case. This limited discovery will "substantially contribute to moving th[e] case forward." Semitool, 208 F.R.D. at 277.

Further, Defendants are not prejudiced because they have no legitimate expectation of privacy in the subscriber information that they voluntarily provided to the ISP. See Interscope Records v. Does 1-14, 558 F.Supp.2d 1176, 1178 (D. Kan. 2008) (a person using the Internet to distribute or download copyrighted music without authorization is not entitled to have their identity protected from disclosure under the First Amendment); Guest v. Leis, 255 F.3d 325, 336 (6th Cir. 2001) ("computer users do not have a legitimate expectation of privacy in their subscriber information because they have conveyed it to another person—the system operator"); Sony Music Entertainment, Inc. v. Does 1-40, 326 F.Supp.2d 556, 566 (S.D.N.Y. 2004) ("defendants have little expectation of privacy in downloading and distributing copyrighted

songs without permission"); Arista Records, LLC v. Does No. 1, 254 F.R.D. 480, 481 (E.D.N.C. 2008). The Doe Defendants are pseudonymous, not anonymous and the ISPs can readily identify each Doe Defendant. (Farris Decl. ¶ 10.) By entering into a service agreement, Defendants knowingly volunteered personal information to the ISP. Consequently, Amselfilm should be permitted to obtain discovery of the Doe Defendants' identities, as these Defendants have no legitimate expectation of privacy in this information.

### III. The Doe Defendants have no protectable privacy interest and will not suffer an undue burden from having their identities provided to Amselfilm.

The Doe Defendants have no legitimate expectation of privacy in the subscriber information that they voluntarily provided to the ISP. See Interscope Records v. Does 1-14, 558 F.Supp.2d 1176, 1178 (D. Kan. 2008) (a person using the Internet to distribute or download copyrighted music without authorization is not entitled to have their identity protected from disclosure under the First Amendment); Guest v. Leis, 255 F.3d 325, 336 (6th Cir. 2001) ("computer users do not have a legitimate expectation of privacy in their subscriber information because they have conveyed it to another person—the system operator"); Sony Music Entertainment, Inc. v. Does 1-40, 326 F.Supp.2d 556, 566 (S.D.N.Y. 2004) ("Defendants have little expectation of privacy in downloading and distributing copyrighted songs without permission."); Arista Records, LLC v. Does No. 1, 254 F.R.D. 480, 481 (E.D.N.C. 2008). The Defendants are pseudonymous, not anonymous, and the ISPs can readily identify him or her. (Farris Decl. ¶ 10.) By entering into a service agreement, the Defendants knowingly volunteered personal information to the ISP. The individual Defendants should not be permitted to use the Internet as a shield for illegal activity.

Merely being named as a defendant in this suit does not expose any of the Doe Defendants to an unreasonable burden. As explained in Section I above, Amselfilm bases its

16

Complaint on a joint enterprise theory of liability, subjecting the joint enterprise of the Swarm to jurisdiction in any forum in which the Swarm is subject to jurisdiction. As a member of the Swarm, the Movant is subject to the jurisdiction of this Court and, thus, no undue burden can be shown.

## CONCLUSION

Amselfilm requires limited discovery as to the true identities of the Doe Defendants before it can serve its Summons and Complaint and vindicate its rights. Without this basic information, the Internet will serve as a shield to illegal copyright infringement. Amselfilm's case will remain at a standstill and the interests of justice will not advance until this case can move forward. Amselfilm respectfully requests that this Court grant leave to take limited, expedited discovery.

DATED: July 13, 2012            THE MCDANIEL LAW FIRM, PC

                                By: _____
                                    Jay R. McDaniel, Esq.
                                    *Attorneys for Plaintiff*